**CHEMICAL WASTE MANAGEMENT, INC. and Waste Management of North America, Inc., Petitioners,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY and Lee M. Thomas, Administrator, Respondents.**

No. 88–1490.

United States Court of Appeals, District of Columbia Circuit.

Argued March 6, 1989.

Decided May 5, 1989.

Daniel M. Darragh, of the bar of the State of New York, pro hac vice, by special leave of Court, for petitioners.

J. Brian Molloy and Joan Z. Bernstein, for petitioners.

William R. Weissman and Douglas H. Green, for intervenors Edison Elec. Institute, et al., were on the joint brief, for petitioners and intervenors.

Mark R. Haag, Attorney, Dept. of Justice, with whom Donald A. Carr, Acting Asst. Atty. Gen., Land and Natural Resources Div., Dept. of Justice, and Caroline H. Wehling, Attorney, U.S. E.P.A., were on the brief, for respondent.

Roger J. Marzulla, Attorney, Dept. of Justice, also entered an appearance, for respondent.

Before WALD, Chief Judge, and STARR and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Petitioners Chemical Waste Management, Inc. and Waste Management of North America seek review of Environmental Protection Agency regulations, 40 C.F.R. Part 24 (1988), that establish informal procedures for administrative hearings concerning the issuance of corrective action orders under § 3008(h) of the Resource Conservation and Recovery Act (RCRA), as modified by the Hazardous and Solid Waste Amendments of 1984. 42 U.S.C. § 6928(h) (1982 & Supp.1985). We conclude that the regulations represent a reasonable interpretation of an ambiguous statutory provision and are not, on their face, inconsistent with the requirement of due process. Accordingly, we deny the petition for review.

## I. BACKGROUND

Congress enacted RCRA in 1976 to establish a comprehensive program for regulation of hazardous waste management and disposal. The statute requires generally that the operator of any hazardous waste treatment, storage, or disposal facility obtain a permit, RCRA § 3005, 42 U.S.C. § 6925, but facilities in existence as of 1980 may continue to operate as "interim facilities" pending agency action on their permit applications, RCRA § 3005(e), 42 U.S.C. § 6925(e).

### A. Formal Adjudication under Part 22.

Subsection (a) of RCRA § 3008 authorizes EPA to enter orders assessing civil penalties, including suspension or revocation of permits, for violation of RCRA regulations. 42 U.S.C. § 6928(a). Subsection (b) provides that, upon request made within thirty days of the issuance of a subsection (a) order, EPA "shall promptly conduct a public hearing." Accordingly, the agency is authorized to "issue subpoenas for the attendance and testimony of witnesses and the production of relevant papers, books,

and documents, and may promulgate rules for discovery procedures." RCRA § 3008(b), 42 U.S.C. § 6928(b).

In 1978, EPA promulgated procedural regulations to implement the "public hearing" provision of subsection (a). 40 C.F.R. Part 22. These procedures conform to the provisions of the Administrative Procedure Act for formal adjudication. 5 U.S.C. §§ 556 & 557. For example, an Administrative Law Judge presides at the hearing, 40 C.F.R. § 22.03(a), and each party has the right to call and to cross-examine witnesses, 40 C.F.R. § 22.22(b).

In the preamble accompanying these regulations, EPA explained its selection of formal adjudicatory procedures. Although, in EPA's view, there are "many cases" in which the term "public hearing" should not be read to require formal adjudicatory procedures, EPA concluded that "the nature of the decision at issue in [subsection (a)] cases indicates ... that such formal procedures were probably intended." 43 Fed. Reg. 34738 (1978). In such cases, the agency "will be accusing someone of violating established legal standards through their past conduct, and will be seeking to impose a sanction for it.... In addition, the facts at issue will be specific ones involving the past conduct of regulated persons." *Id.*

## B. *Informal Adjudication Under Part 24*

In the Hazardous and Solid Waste Amendments of 1984, Congress added to § 3008 a new subsection (h), authorizing the Administrator of EPA to issue "an order requiring corrective action" whenever he "determines that there is or has been a release of hazardous waste into the environment" from an interim facility. RCRA § 3008(h)(1), 42 U.S.C. § 6928(h)(1). Such orders must indicate "the nature of the required corrective action or other response measure, and ... specify a time for compliance," and may include suspension or revocation of the facility's authorization to operate as an interim facility. RCRA § 3008(h)(2), 42 U.S.C. § 6928(h)(2). The Administrator may assess a civil penalty of up to $25,000 per day for noncompliance

with a corrective action order. *Id.* The 1984 Amendments also modified subsection (b) to make it clear that those subject to corrective action orders under the new subsection (h) have the right to a "public hearing."

To govern subsection (h) hearings, EPA promulgated the procedural regulations here under review, 40 C.F.R. Part 24. Those rules specifically provide that the formal adjudicatory procedures of Part 22 shall be applicable only to challenges to subsection (h) corrective action orders that include a suspension or revocation of interim status or an assessment of civil penalties for noncompliance. 40 C.F.R. § 24.01. If the order calls upon the interim facility operator merely to undertake an investigation or to do so in combination with interim corrective measures, then, depending upon the burden entailed by such measures, the agency will use either the informal adjudicatory procedures provided in Subpart B of Part 24 (for interim corrective measures that are "neither costly nor technically complex," 40 C.F.R. § 24.80) or those in Subpart C of Part 24.

The procedures in Subparts B and C are substantially similar insofar as is relevant to this case. The crucial point is that both subparts set forth informal rather than formal adjudicatory procedures. Under either subpart, the operator of a hazardous waste facility may submit written information and argument for inclusion in the record, 40 C.F.R. §§ 24.10(b) & 24.14(a)(1); make an oral presentation at the hearing itself, 40 C.F.R. §§ 24.11 & 24.15(a); and be assisted at hearing by legal and technical advisors, *id.* Direct examination and cross-examination of witnesses is not permitted, but the Presiding Officer may direct questions to either party. *Id.* The Presiding Officer is to be either "the Regional Judicial Officer ... or another attorney employed by the Agency, who has had no prior connection with the case, including performance of any investigative or prosecuting functions." 40 C.F.R. §§ 24.09 & 24.13(a). With respect to both Subpart B and Subpart C proceedings, EPA, when issuing a corrective action order, shall deliver to the operator "all relevant doc-

uments and oral information (which has been reduced to writing), which the Agency considered in the process of developing and issuing the order, exclusive of privileged internal communications." 40 C.F.R. § 24.03(b).

The Presiding Officer is to review the record and to file a recommended decision with the EPA Regional Administrator, 40 C.F.R. §§ 24.12 & 24.17. The Regional Administrator, in turn, is to receive comments from the parties and to render a final decision, 40 C.F.R. § 24.18, from which an aggrieved party may seek judicial review under the APA.

## II. *Chevron* ANALYSIS

Petitioners argue initially that the informal procedures of Part 24 are inconsistent with the intent of Congress in enacting and amending § 3008. To this end, petitioners make three specific contentions: first, that the language of subsection (b), as interpreted by EPA in its 1978 implementing regulations, requires formal procedures in all subsection (h) adjudications; second, that the legislative history of the 1984 Amendments demonstrates Congress's intention that EPA use the same formal procedures for the issuance of the new subsection (h) orders as the agency had theretofore established for the issuance of subsection (a) orders; and, third, that precedent in this circuit erects a presumption that when Congress refers to an adjudication as a "hearing," it intends that formal procedures be used.

We approach petitioners' arguments within the framework that the Supreme Court decreed in *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), for judicial review of an agency's interpretation of a statute under its administration. At the outset, we ask whether "Congress has directly spoken to the precise question at issue," *id.* at 842, 104 S.Ct. at 2781; if so, then we "must give effect to the unambiguously expressed intent of Congress" and may not defer to a contrary agency interpretation, *id.* at 842–43, 104 S.Ct. at 2781–82. If the statute is "silent or ambig-

uous with respect to the specific issue," however, we proceed to ask "whether the agency's answer is based on a permissible construction of the statute," *id.* at 843, 104 S.Ct. at 2782; if so, then we must defer to the agency's construction.

## A. Chevron *Step One.*

■ Before turning to petitioners' principal arguments based on the requirement of a "public hearing," we may briefly dispose of a related argument based on the provision in subsection (b) that the EPA "may promulgate rules for discovery procedures." According to petitioners, this nominally permissive statement implies that Congress contemplated, and that the agency must therefore provide, formal procedures in which discovery plays a part. In response to a similar contention at the rulemaking stage, EPA read subsection (b) to "suggest[ ] that [a] hearing which did not contain this feature most commonly associated with adjudicatory hearings would also be acceptable." 53 Fed.Reg. at 12258. Given the implicit but presumably intentional distinction in the statute between things that the agency "shall" do (initiate a "public hearing" upon request) and those that it "may" do (promulgate discovery rules), we reject the argument that the statute compels the use of procedures involving discovery and do not reach the suggested inference from discovery to formal hearing procedures generally.

■ 1. *Prior Agency Interpretation.* As to petitioners' argument based upon the hearing requirement, we observe initially that the statutory language, taken alone, does not show that Congress "has directly spoken to the precise question at issue." Subsection (b) requires a "public hearing" but does not, by its terms, indicate whether Congress intended that formal or informal hearing procedures be used. Petitioners claim, however, that in 1978 EPA interpreted the phrase "public hearing" to require formal adjudication when it promulgated procedures to govern hearings on orders issued under subsection (a). We think they misread the record in this regard.

Although EPA did believe that Congress "intended" it to use formal procedures for hearings on orders under subsection (a), the agency made clear that this conclusion rested upon the particular nature of the issues raised by such orders, not upon the force of the statutory language alone. 43 Fed.Reg. 34738 (1978). EPA thus did not adopt the view that the reference to a "public hearing" in subsection (b) necessarily or always imposes a requirement of formal procedures. Even if EPA had taken that position, moreover, it would remain free to change its interpretation in order to permit the use of informal procedures to implement the 1984 Amendments, provided that its new interpretation is otherwise legally permissible and is adequately explained. *See United Technologies Corp. v. EPA*, 821 F.2d 714, 723 (D.C.Cir.1987). We therefore turn to petitioners' argument based upon the 1984 Amendments.

2. *The 1984 Amendments.* When Congress authorized EPA to issue corrective action orders under subsection (h), it also extended the right to a "public hearing" under subsection (b) to encompass such orders. According to petitioners, Congress's decision to apply the existing hearing provision of subsection (b)—at a time when EPA had only formal adjudicatory procedures in effect—shows that Congress wished also to apply those formal procedures to hearings on orders issued pursuant to the new subsection (h). To support this inference, petitioners rely heavily on a statement by Senator Chafee, a sponsor of the 1984 Amendments, indicating that the "procedures *set forth in subsection (b)* are made applicable to orders issued under this new subsection [ (h) ]." 130 Cong.Rec. S39175 (daily ed. July 15, 1984) (emphasis added).

The short answer to petitioners' argument is that the Senator referred not to the procedures set forth in Part 22 of EPA's regulations implementing subsection (b), but to the "procedures set forth in" the statutory subsection itself. Absent a more specific reference to the formal procedures of Part 22, we may not infer that Senator Chafee and his colleagues intended to engraft those regulations onto § 3008. *See*

*AFL–CIO v. Brock*, 835 F.2d 912, 915 (D.C. Cir.1987) ("express congressional approval of an administrative interpretation [required] if it is to be viewed as statutorily mandated").

Without distinguishing the *AFL–CIO* case, petitioners maintain that Senator Chafee's failure to refer expressly to Part 22 is "immaterial," since he did cite "the dispositive statutory [sub]section." This contention would be relevant if the language of the statute made clear the type of procedures intended. As we have seen, however, that is not the case. Absent a reference to Part 22, Senator Chafee's statement remains, at best, ambiguous.

3. *Circuit Precedent.* Petitioners point to our statement in a footnote in *Union of Concerned Scientists v. U.S. NRC*, 735 F.2d 1437, 1444 n. 12 (D.C.Cir.1984) (*UCS*), that "when a statute calls for a hearing in an adjudication the hearing is presumptively governed by 'on the record' procedures," notwithstanding omission of the phrase "on the record" in the statute. *See also Seacoast Anti–Pollution League v. Costle*, 572 F.2d 872, 877 (1st Cir.1978); *Marathon Oil v. EPA*, 564 F.2d 1253, 1264 (9th Cir. 1977). For the reasons set out below, however, we decline to adhere any longer to the presumption raised in *UCS*.

For perspective, we note first that the very footnote cited by petitioners makes clear that the issue in that case was "whether the NRC can, in its discretion, bypass [a statutory] hearing requirement altogether on issues material to its licensing decisions," and that "we refrain[ed] from holding outright that [the hearing provision in question there] requires 'on the record' hearings." 735 F.2d at 1444 n. 12. Our statement about the presumption to that effect was therefore dicta. We did not actually rely on the presumption we announced, but rather inferred that Congress intended the use of formal adjudicatory procedures based both upon NRC's unsuccessful efforts to convince Congress to do away with such procedures and upon NRC's consistent position, over a twenty year period, that the statute required for-

mal procedures. *Id.* No such contextual circumstances exist here.

■ More important, *UCS* and its kin, *Seacoast* and *Marathon,* all predate the Supreme Court's decision in *Chevron.* Under that decision, it is not our office to presume that a statutory reference to a "hearing," without more specific guidance from Congress, evinces an intention to require formal adjudicatory procedures, since such a presumption would arrogate to the court what is now clearly the prerogative of the agency, *viz.,* to bring its own expertise to bear upon the resolution of ambiguities in the statute that Congress has charged it to administer. In effect, the presumption in *UCS* truncates the *Chevron* inquiry at the first step by treating a facially ambiguous statutory reference to a "hearing" as though it were an unambiguous constraint upon the agency. We will henceforth make no presumption that a statutory "hearing" requirement does or does not compel the agency to undertake a formal "hearing on the record," thereby leaving it to the agency, as an initial matter, to resolve the ambiguity.*

While an agency might not be able reasonably to read a requirement that it conduct a "hearing on the record" to permit informal procedures in the converse situation to that presented here, an agency that *reasonably* reads a simple requirement that it hold a "hearing" to allow for informal hearing procedures must prevail under the second step of *Chevron.* As usual in cases involving *Chevron's* second step, the court will evaluate the reasonableness of the agency's interpretation using the normal tools of statutory interpretation—such as legislative history, structural inferences, or exceptional circumstances of the type presented in *UCS.*

**B. Chevron** *Step Two.*

■ In the alternative, petitioners contend that EPA failed to provide a reasoned explanation, as required under the "arbitrary or capricious" standard of APA

§ 706, 5 U.S.C. § 706(2)(A), to support its conclusion that corrective action orders under subsection (h) are amenable to informal adjudicatory procedures. Since it would clearly be unreasonable for the agency to resolve a statutory ambiguity to support an arbitrary result, petitioners' position is functionally a *Chevron* step two contention that EPA's interpretation of the statute is unreasonable. This is the issue joined.

Specifically, petitioners attack EPA's claims that subsection (h) orders will pose fewer factual issues than do subsection (a) orders; that any factual issues that do arise can be resolved by considering documents and oral statements without need of trial-type examination of witnesses; and that informal procedures will allow the agency to respond more quickly to releases of hazardous waste.

1. *The Number and Nature of Factual Issues.* In its preamble accompanying the Part 24 regulations, EPA predicts that "[subsection] (h) cases will present fewer factual issues than the typical case involving an RCRA [subsection] (a) compliance order," since "questions as to whether certain events or violations occurred, the timing of certain events/violations, the seriousness of the violation, [and] the economic benefit to respondent of the violation" will arise less frequently. 53 Fed.Reg. at 12257. In addition, EPA said that those factual issues that do arise "will relate almost entirely to technical (or policy) matters" that create "little need to establish witness veracity or credibility through observation of a witness's demeanor on cross-examination" and therefore "can just as easily (perhaps more effectively) be resolved through analysis of the administrative record and the written submissions and oral statements of the parties." *Id.*

Petitioners argue first that EPA has ignored the additional benefits—in terms of increased accuracy, for example—that formal procedures may bring to fact finding. Second, petitioners observe that some subsection (h) orders may involve issues that

---

* Our discussion rejecting the presumption set forth in the *UCS* dictum has been separately circulated to and approved by the entire court, and thus constitutes the law of this circuit. *See Irons v. Diamond,* 670 F.2d 265, 268 n. 11 (D.C. Cir.1981).

could be "susceptible to varying interpretations." The agency may safely demur to these charges; neither of them undercuts the validity of its decision to establish procedures based on the *typical* subsection (h) order. The Part 24 regulations, furthermore, leave the Presiding Officer with a degree of discretion to tailor hearing procedures to the needs of the particular case, *see, e.g.,* 40 C.F.R. §§ 24.11 & 24.15(a) (Subparts B & C) (Presiding Officer "may address questions" to either party); § 24.11 (Subpart B) (Presiding Officer "may ... allow technical and legal discussions and interchanges between the parties, including responses to questions to the extent deemed appropriate"); § 24.24(d) (Subpart C) (respondent may request permission to submit up to 25 written questions to EPA "concerning issues of material fact"), which should be adequate to meet precisely the problems petitioners anticipate, in the event that they ever arise.

2. *Necessity for Prompt Response.* The preamble to the notice promulgating Part 24 also refers to the seemingly obvious "need to respond quickly to releases of hazardous waste." 53 Fed.Reg. at 12257. More specifically, in its brief to this court, EPA also quotes Senator Chafee's statement, introducing the 1984 Amendments, that "[s]ince there are some 8,000 interim facilities, compared to 115 permitted facilities, it is most appropriate and necessary to extend the corrective action requirement to interim status facilities and to provide the Administrator with the authority to impose such requirements quickly." 130 Cong. Rec. S9175 (daily ed. July 25, 1984).

As petitioners point out, however, Senator Chafee and his colleagues were concerned not with delays in the adjudication of corrective action orders but, instead, with impediments to EPA's regulation of interim facilities; prior to the 1984 Amendments, EPA was authorized to order corrective action only with respect to permitted facilities. *See id.;* H.R.Conf.Rep. No. 1133, 98th Cong. 110 (1984), U.S.Code Cong. & Admin.News 1984, pp. 5576, 5681. Subsection (h) was intended to allow EPA to order corrective action with respect to an interim facility without having to wait for

it to complete the permitting process, which Senator Chafee expected would take ten years to cover all interim facilities. 130 Cong.Rec. S9175. Accordingly, EPA cannot rely upon the need for swift adjudication to justify its use of informal hearing procedures.

Nonetheless, we conclude that the agency has provided a reasonable explanation for its choice of informal procedures in Part 24, based on the number and nature of factual issues expected in a typical subsection (h) proceeding.

### III. DUE PROCESS

■ Finally, petitioners contend that Part 24 on its face denies them due process of law, in violation of the Fifth Amendment to the Constitution. When evaluating such an attack on the procedures used by an administrative agency to deprive a person of property, we must consider: (1) "the private interest that will be affected by agency action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; (3) "the Government's interest including the function involved and the fiscal and administrative burdens that the additional ... procedural requirement would entail." *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). In short, the Supreme Court directs us to analyze the anticipated benefits to private interests and costs to the Government of the procedures allegedly required by the Due Process Clause.

### A. *Private Interests.*

Petitioners claim that subsection (h) orders may, in some instances, require the operator of an interim facility to undertake investigations and corrective measures that can have "a multi-million dollar impact." Petitioners offer no response, however, to EPA's observation that, over the run of orders issued under subsection (h), the costs of corrective action will vary widely. 53 Fed.Reg. at 12257. In light of this variance, we find no fault in EPA's decision

to design its Part 24 procedures based on the stakes that it expects will be involved in the great majority of corrective action proceedings that entail neither suspension of interim authorization nor assessment of civil penalties. The possibility that these procedures might prove inadequate to safeguard the interest of the operator in a particular case involving costly investigations or corrective measures does not count for much in the calculus of benefits and costs we make when asked to strike down administrative procedures in a facial due process challenge.

### B. *Risk of Error.*

Under the second *Eldridge* factor, petitioners point to two distinct sources of error in the new procedural regulations.

1. *Lack of Substantive Standards.* Petitioners initially observe that the 1984 Amendments to RCRA require EPA to develop standards for corrective action, RCRA § 3004(u), 42 U.S.C. § 6924(u), and that the agency has not yet done so. From this, petitioners infer that the Presiding Officer in a subsection (h) hearing will lack any substantive standards to guide his decision. EPA, on the other hand, points to three available sources of guidance: (1) regulations for corrective action upon the release of hazardous waste from land disposal units, 40 C.F.R. Part 264, Subpart F; (2) various agency "guidance documents to aid decisions on RCRA corrective action"; and (3) regulations for remedial actions under the Comprehensive Environmental Response, Compensation, and Liability Act, 40 C.F.R. Part 300. Since, in reply, petitioners do not question the utility of these sources, we accept EPA's representation that, until such time as the agency promulgates standards specifically for corrective actions pursuant to § 3004(u), Presiding Officers will find in these sources standards adequate to guide their decisions.

2. *Lack of Formal Adjudicatory Procedures.* Petitioners renew their claim, this time as a matter of due process, that EPA must use formal adjudicatory procedures. Petitioners fail to explain how such procedures will significantly advance the accuracy of an adjudicative process in which the issues typically do not require determinations of witness credibility but turn instead upon technical data and policy judgments. In *Eldridge* itself, the Court states that such proceedings present less of a need for trial-type procedures. 424 U.S. at 343–44, 96 S.Ct. at 906–07.

According to petitioners, due process requires that an ALJ conduct a subsection (h) hearing. Petitioners are particularly critical of the provisions of Part 24 that allow agency attorneys to serve as Presiding Officers, provided only that they have "had no prior connection with the case, including the performance of any investigative or prosecuting functions." 40 C.F.R. §§ 24.09 & 24.13(a). Petitioners fear that even a Presiding Officer who meets this condition may be influenced by "institutional biases and prosecutorial zeal"; indeed, the Presiding Officer might, for all that the regulation requires, be a subordinate of the prosecuting attorney within EPA's internal hierarchy.

The Supreme Court has held that even the combination, in a single administrative decision maker, of investigative and adjudicative functions—which the EPA regulations plainly forbid—"does not, without more, constitute a due process violation"; rather, "the special facts and circumstances of the case ... [must indicate] that the risk of unfairness is intolerably high." *Withrow v. Larkin*, 421 U.S. 35, 58, 95 S.Ct. 1456, 1470, 43 L.Ed.2d 712 (1975). Moreover, in challenging a particular adjudication on this ground, the complaint must "overcome the presumption of honesty and integrity in those serving as adjudicators" by showing "a risk of actual bias or prejudgment." *Id.* at 47, 95 S.Ct. at 1464. In light of *Withrow*'s stringent standard for an "as applied" attack on procedures that allow the combination of investigative and adjudicative functions, we find no basis for petitioners' broad facial challenge, which by its nature deprives us of the particularized information necessary to evaluate a claim of probable bias.

Finally, petitioners attack the regulations on the ground that the Presiding Officer will be unable to resolve the intricate tech-

nical issues that may arise in a subsection (h) proceeding. They do not, however, explain why an agency attorney would be any less equal to that task than would be the ALJ they prefer.

In sum, petitioners have shown little if any avoidable risk of error arising from the procedural regulations they challenge.

### C.   *The Government's Interest.*

On the Government's side of the *Eldridge* ledger, EPA estimates that "roughly half of the cost to the Agency of participating in full adjudicatory hearings will be saved by holding hearings under the [informal Part 24] procedures." 53 Fed.Reg. at 12257. By contrast, the cost of formal procedures, according to EPA, would "significantly impair [its] ability to enforce" subsection (h). *Id.* at 12258.

Petitioners counter that the failure to use formal procedures will increase the risk that a court will subsequently find the administrative record inadequate for judicial review, thereby necessitating a costly remand for additional proceedings. Along similar line, petitioners claim that technical personnel involved in the hearing will produce "better" reports when they "know that their work may be tested" by formal procedures. Petitioners neglect, however, to compare the asserted increase in the cost of occasional remands against the substantial (and undisputed) savings to the agency that will accrue in all other cases. Without any experience to go by, we cannot infer that the effects described by petitioners will be more than a modest offset to the savings EPA will achieved by using informal procedures.

\*     \*     \*     \*     \*     \*

In sum, the cost-benefit analysis mandated by *Eldridge* indicates that, to the modest extent that EPA's Part 24 regulations do implicate the private interest in avoiding the expense of unnecessary corrective actions, formal procedures do not promise a sufficient lowering of the risk of error to justify their significant expense to the Government. We therefore hold that the Part 24 regulations are not inconsistent on their face with the requirements of due process.

We suppose that the absence of formal safeguards could prove troublesome in a case that involved both high financial stakes to the operator and either substantive issues that would benefit greatly from development through trial-type procedures, or a Presiding Officer with "actual bias." That case has not yet arisen, however. From the face of the Part 24 regulations, neither petitioners nor we have any indication of how the agency will apply them in particular instances. There is no reason to doubt, however, that by being reasonably sensitive to the needs of each case, EPA can avoid the problems posited by petitioners.

### IV.   CONCLUSION

Because we conclude that the procedures for hearings on corrective action orders under subsection (h) reflect a reasonable interpretation of an ambiguous statutory mandate and are not, on their face, inconsistent with the constitutional requirement of due process, the petition for review is

*Denied.*