# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 9, 2011                    Decided July 1, 2011

No. 10-1227

SOUTHWEST AIRLINES CO., ET AL
PETITIONERS

v.

TRANSPORTATION SECURITY ADMINISTRATION,
RESPONDENT

———

Consolidated with 10-1228, 10-1229, 10-1230, 10-1231,
10-1232, 10-1236, 10-1237, 10-1238, 10-1240, 10-1241,
10-1242, 10-1243, 10-1244, 10-1246, 10-1247, 10-1248,
10-1249, 10-1250

———

On Petitions for Review of Final Orders
of the Transportation Security Administration

———

*M. Roy Goldberg* argued the cause for petitioners. With
him on the briefs were *Robert W. Kneisley*, *Carl B. Nelson,
Jr.*, *Bruce H. Rabinovitz*, *Jonathan B. Hill*, *J. Parker
Erkmann*, *Robert E. Cohn*, *Patrick R. Rizzi*, *Lorraine B.
Halloway*, *Lester M. Bridgeman*, *Thomas Newton Bolling*,

*Richard Mathias*, and *David Endersbee*. *Christopher T. Handman* entered an appearance.

*Jeffrey Clair*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Tony West*, Assistant Attorney General, and *Scott R. McIntosh*, Attorney.

Before: HENDERSON, BROWN, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Circuit Judge* HENDERSON joins.

Dissenting opinion filed by *Circuit Judge* BROWN.

KAVANAUGH, *Circuit Judge*: Until 2001, commercial airlines were responsible for screening people and property at U.S. airports. That changed after al Qaeda terrorists boarded airplanes in Boston, Newark, and Washington, D.C., and attacked the United States on September 11, 2001. Congress created the Transportation Security Administration and directed it to take responsibility for airport screening. TSA's screening operations are funded, in part, by fees that the agency collects from airlines. By statute, those fees may not exceed the amount that airlines paid for screening passengers and property during the year 2000. 49 U.S.C. § 44940(a)(2)(B)(i). Because the fees airlines pay to TSA are capped at the level of their 2000 costs, the lower the airlines' screening costs in 2000, the better it is for the airlines now. But determining how much the airlines spent in 2000 on passenger and property screening at airports has proved to be a difficult exercise. Hence, this drawn-out litigation: Southwest and 19 other airlines allege that TSA's determination of their year 2000 costs was arbitrary and

capricious for purposes of the Administrative Procedure Act and also unconstitutional. We disagree, and we deny the petitions for review.

I

Shortly after the al Qaeda attacks of September 11, 2001, Congress passed and President Bush signed the Aviation and Transportation Security Act. Pub. L. No. 107-71, 115 Stat. 597 (2001). Under that statute, the Federal Government – specifically, the newly created Transportation Security Administration – assumed responsibility for airport security functions that were previously undertaken by private airlines. TSA took over the task of screening all passengers and property at U.S. airports.

By statute, TSA imposes two kinds of fees to fund its airport security services: a fee on passengers and a fee on airlines.

The fee on airlines is at issue here. That fee may not exceed the amount that TSA determines airlines paid for screening passengers and property during the year 2000. 49 U.S.C. § 44940(a)(2)(B)(i). In other words, the airline fee is designed to track the costs that airlines incurred to screen passengers and property when airlines performed that function.

To determine how much money airlines paid to screen passengers and property in the year 2000, TSA initially relied on cost data submitted by the airlines themselves. Suspicion mounted that airlines were low-balling their 2000 costs so as to reduce the fees they would have to pay to TSA under the new system. In 2004, Congress directed the Government Accountability Office to independently review airlines' year

2000 screening costs. *See* Dep't of Homeland Security Appropriations Act for 2005, Pub. L. No. 108-334, Title II, 118 Stat. 1298 (2004). Upon completing that review, the GAO concluded that total airline screening costs in the year 2000 were $448 million – $129 million more than the airlines had claimed. Acting on that estimate, TSA assessed additional fees on numerous airlines for 2005 and future years.

It turned out, however, that GAO's estimate of year 2000 screening costs included the costs of screening *non-passengers* as well as passengers and property. The airline fee imposed by TSA, by contrast, is capped at the amount that TSA determines airlines "paid . . . for screening *passengers* and property" in the year 2000. 49 U.S.C. § 44940(a)(2)(B)(i) (emphasis added). Numerous airlines – including many of the petitioners here – challenged TSA's fee increases in this Court, arguing that TSA "violated the plain language of the [statute] by basing its calculation of the fees on a GAO estimate which had included the costs of screening *non-*passengers." *Southwest Airlines Co. v. TSA ("Southwest I")*, 554 F.3d 1065, 1069 (D.C. Cir. 2009). This Court agreed, and we remanded the matter to TSA for the agency to exclude the costs of screening non-passengers from its calculation of airline fees and to award refunds accordingly. *See id.* at 1070, 1076.

On remand, TSA was thus required to determine how much of the $448 million in year 2000 screening costs was attributable to screening passengers and property. To do so, the agency commissioned a report from Simat, Helliesen & Eichner, Inc., a reputable airline consultant. SH&E conducted numerous interviews with airport and government officials and reviewed airport survey data on year 2000 screenings. SH&E estimated that approximately 61% of individual

screenings in 2000 were attributable to passengers and 39% to non-passengers. SH&E also determined that a large proportion of the airlines' screening costs were fixed and therefore would not decrease if non-passengers were excluded. SH&E concluded that the cost of screening passengers and property in the year 2000 was approximately $420 million.

The airlines submitted a separate report from Campbell Aviation Consultants, known as the Campbell report. The Campbell report concluded that the relevant year 2000 costs were $305 million, not $420 million.

But TSA found SH&E's report more persuasive, and the agency recalculated each airline's fee liability based on the $420 million figure. TSA sent a written notice of its refund determinations to each airline. The airlines now seek review of TSA's decisions.

## II

The airlines raise several challenges to TSA's remand decisions, but only one issue requires extended discussion. According to the airlines, TSA's decisions were arbitrary and capricious because TSA should not have relied on the SH&E report commissioned by TSA, or at least should have more fully explained why it rejected the conclusions of the Campbell report submitted by the airlines.[1]

---

[1] As a threshold matter, TSA argues that we do not have jurisdiction over all the airlines' claims. It is true that the Aviation and Transportation Security Act limits judicial review of TSA's airline fee determinations. *See Southwest Airlines Co. v. TSA ("Southwest I")*, 554 F.3d 1065, 1069 (D.C. Cir. 2009) ("Before reaching the merits, we need to address the effect of two ATSA provisions for jurisdiction-stripping."). The ATSA provides that

On remand, the issue before TSA concerned how much the airlines spent in 2000 to screen passengers and property, excluding the cost of screening non-passengers. To resolve that issue, TSA had to determine how many individual screenings in 2000 were of passengers versus non-passengers. In assessing how TSA performed that task, it is important to understand that there was no contemporaneous, objectively verified record of the number of screenings. The number of screenings was not tracked in the way that, for example, attendance at a baseball game is tracked through turnstiles. To be sure, airlines had at least a rough idea of the number of *passengers*. But no one apparently kept records of the number of screenings of *non-passengers*. And thus there was no good way to know what percentage of screenings were of passengers. Given the difficult task this Court assigned it, the TSA on remand commissioned an expert report to help the agency make the best estimate it could about the percentage

---

"[d]eterminations of the Under Secretary under this subparagraph [stating the limitations on airline fees based on year 2000 costs] are not subject to judicial review." Pub. L. No. 107-71, Title I, § 118, 115 Stat. 597, 626 (2001). In 2007, however, Congress created an exception to that rule for "estimates and additional collections made pursuant to the appropriation for Aviation Security in Public Law 108-334 [i.e., collections made pursuant to the 2005 Appropriations Act that instructed GAO to recalculate year 2000 costs]: . . . *Provided* . . . [t]hat such judicial review shall be limited only to additional amounts collected by the Secretary before October 1, 2007." Pub. L. No. 110-161, Title V, § 540, 121 Stat. 1844, 2079 (2007), *codified at* 49 U.S.C. § 44940(a)(2)(B)(iv). Because the fees at issue here were collected pursuant to the 2005 appropriations law, this Court may review TSA's airline fee determinations as applied to amounts collected before October 1, 2007. *See Southwest I*, 554 F.3d at 1069. Each of the airlines' claims here applies in part to amounts collected by TSA before October 1, 2007. We therefore may review the issues raised by the airlines. *Cf. id.*

of screenings attributable to passengers versus non-passengers. SH&E performed a detailed analysis and ultimately concluded that 61% of individual screenings were of passengers and that airlines incurred $420 million in costs from screening passengers and property in 2000.

The airlines provided TSA with an alternative to the SH&E report – a report from Campbell Aviation Consultants. The Campbell report also calculated airport screening costs attributable to passengers and property, excluding non-passengers. In so doing, Campbell relied heavily on an earlier Department of Transportation report indicating that a total of 1.812 billion individuals were screened in U.S. airports during the year 2000. Relying on that number, and on the fact that the total number of passengers in 2000 was estimated to be 527 million (some of whom were screened more than once), Campbell estimated that about 36% of all individual screenings at U.S. airports in the year 2000 were of passengers. Based on that percentage, Campbell concluded that airlines spent about $305 million to screen passengers and property in the year 2000.

The Campbell report's bottom-line number of $305 million – the cost of screening passengers and property in 2000 – was thus $115 million lower than the SH&E report's bottom-line number of $420 million. The fundamental dispute in this case concerns that $115 million difference.

The airlines contend that TSA should not have relied on the SH&E report and instead should have accepted the Campbell report, or at least better explained why it rejected the Campbell report. But in TSA's letter to each airline, the agency stated that it had "conducted a thorough review of the Campbell report that included an examination of both the data and methodologies utilized to construct the report findings."

*See, e.g.*, Letter from Transportation Security Administration to Gary Kelly, Chairman of the Board, Chief Executive Officer, and President, Southwest Airlines at 2 (June 22, 2010) (J.A. 468). In light of that "thorough review," TSA concluded that the Campbell report was "insufficient for further consideration due to the report's use of limited data and broad, simplistic methodologies that did not consider the full spectrum of specific cost categories." *Id.* The letter also explained SH&E's more extensive methodology. *Id.*

TSA thus considered the Campbell report and its underlying data, and TSA explained why the Campbell report was inferior to the SH&E report on which the agency relied. TSA adequately considered the submissions of dueling experts before determining year 2000 screening costs for passengers and property. When an agency "adequately considers contradictory evidence, . . . our standard of review does not permit a reviewing court to displace the [agency's] choice between conflicting views." *American Wrecking Corp. v. Sec'y of Labor*, 351 F.3d 1254, 1261 (D.C. Cir. 2003). We will not second-guess TSA's determination of this obscure calculation in a "data-poor environment" in which "*[a]ny* decision . . . would have required considerable guesswork." *Southwest Airlines Co. v. TSA ("Southwest I")*, 554 F.3d 1065, 1073 (D.C. Cir. 2009); *cf. Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376 (1989) (controversy presents "a classic example of a factual dispute the resolution of which implicates substantial agency expertise"). Our deference is particularly strong here because the statute says that the fee is based on the amount TSA "determined" the airlines paid in 2000. *See Southwest I*, 554 F.3d at 1071; *AFL-CIO v. Chao*, 409 F.3d 377, 393 (D.C. Cir. 2005) (Roberts, J., concurring in part and dissenting in part) ("We have noted in the past the distinction between the objective existence of certain conditions and the [agency]'s

determination that such conditions are present, stressing that a statute phrased in the latter terms fairly exudes deference to the [agency].") (internal quotation marks omitted).

The airlines also complain that TSA, in rejecting the Campbell report, never specifically mentioned the figure contained in the prior Department of Transportation report on the number of individuals screened in 2000. That argument fails for two reasons.

First, although TSA did not mention the Department of Transportation report by name, TSA explained that it found the data underlying the Campbell report to be limited and thus unreliable – and the most important piece of data in the Campbell report was the figure contained in the Department of Transportation report.

Second, and most importantly, the airlines presented no evidence that the figure in the Department of Transportation report was at all reliable. The Department of Transportation figure was based on industry-reported data, not a government or independent audit of some kind. At the time before September 11 that the airlines provided that information, moreover, they had an incentive to aim high when estimating the number and cost of screenings – so as to convince the Government either to shoulder some of the costs or to impose less burdensome security requirements on the airlines.[2] The airlines here suggest that the Department of Transportation number has talismanic significance because it was published in "official government reports." Reply Br. at 14. But the

_____

[2] Indeed, prior to and immediately after September 11, 2001 – before the current system was implemented – airline industry representatives estimated that airport security cost the airlines nearly $1 billion per year.

report simply regurgitated highly speculative industry-reported numbers when the industry had an incentive to estimate on the high end. Shaky numbers in, shaky numbers out.

In reality, there was no authoritative source for the number of airport screenings during the year 2000 – no government audit of all U.S. airports, no contemporaneous and independently verified calculation. Determining the figure in response to this Court's remand thus involved a good deal of inquiry and ultimately required a dash of art as well as science. TSA was therefore fully justified in relying on the estimates in SH&E's report, which mitigated the uncertainty by conducting a thorough inquiry and deriving data from several independent sources. TSA reasonably concluded and reasonably explained that the SH&E report was far more detailed and reliable than the Campbell report. Given the choice between the SH&E report and the Campbell report, TSA chose the SH&E report – with good reason, and certainly sufficient reason that we cannot overturn that decision on Administrative Procedure Act arbitrary and capricious review.

III

The airlines raise three other arguments, which we can dispose of in short order.

*First*, the airlines contend that TSA's decisions were arbitrary and capricious under the Administrative Procedure Act and also violated the Due Process Clause because the agency did not disclose the SH&E report until the day before it released the fee letters. That argument fails. In "informal adjudication[s]" like these, agencies must satisfy only "minimal procedural requirements." *Butte County, Calif. v.*

*Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).  An agency conducting an informal adjudication has no statutory obligation to prematurely disclose the materials on which it relies so that affected parties may pre-rebut the agency's ultimate decision.  *See Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 655 (1990).  The Due Process Clause likewise does not require more in this kind of case. *See Southwest Airlines Co. v. TSA ("Southwest I")*, 554 F.3d 1065, 1074 (D.C. Cir. 2009).

*Second*, the airlines argue that TSA improperly delegated its responsibilities to SH&E.  We disagree.  In *U.S. Telecom Association v. FCC*, this Court identified "three specific types of legitimate outside party input into agency decision-making processes: (1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving." 359 F.3d 554, 566 (D.C. Cir. 2004).  SH&E was involved in the "fact gathering" stage of TSA's decision-making process: SH&E's report detailed its factual findings on the screening of non-passengers during the year 2000.  TSA evaluated the report, found it reliable, and used it to recalculate airline fees. The agency did not improperly delegate decision-making responsibility to SH&E.

*Third*, the airlines point out that the combined refunds provided by TSA to individual airlines fall short of the total amount due to the airlines under SH&E's methodology.  But TSA has explained that those numbers do not match for a number of reasons, such as that several airlines that paid fees later went out of business.  And the airlines have not pointed to any specific problem with any individual refund decision.

12

\* \* \*

We deny the airlines' petitions for review.

*So ordered.*

BROWN, J., dissenting. My disagreement with the majority is a narrow albeit decisive one. When the Transportation Security Administration calculated passenger- and property-screening costs for the year 2000, it failed to consider another Government agency's estimate of the total number of persons screened that year. Notwithstanding the Airlines' protestations, neither TSA nor the consultant whose analysis it relied on even mentioned that critical data. Although TSA's calculation of the security fee is entitled to broad deference, the agency's discretion is not unlimited. I respectfully dissent, because I think TSA impermissibly ignored contradictory evidence.

The Department of Transportation's Bureau of Transportation Statistics estimated that in the year 2000, the Airlines screened 1.812 billion persons—more than double TSA's estimate of 865.5 million. After we remanded TSA's first decision, *see Southwest Airlines Co. v. TSA* (*Southwest I*), 554 F.3d 1065 (D.C. Cir. 2009), the Airlines provided DOT's estimate to TSA in a consultant's report (the "Campbell Report"). Accepting DOT's estimate would have resulted in a substantially lower security fee for the Airlines.[1] Not surprisingly, TSA did nothing of the sort. Although TSA had promised to consider the Campbell Report, it adopted wholesale its own consultant's report (the "SH&E Report"), which arrived at its estimate of 865.5 million persons screened without even mentioning the Campbell Report or the DOT data it cited.

---

[1] The security fee is capped at the year 2000 cost of screening persons and property ($448 million) minus the cost of screening non-passengers. *See* Maj. Op. at 4; *Southwest I*, 554 F.3d at 1069 (D.C. Cir. 2009). The parties agree there were 527 million passengers in 2000.

TSA's decision on remand gives no reason for choosing SH&E's estimate of the total number of passengers screened over DOT's estimate. The decision's treatment of the Campbell report is confined to a two-sentence paragraph. It is in this cursory statement that the court purports to divine TSA's reasoned consideration of the DOT data:

> TSA conducted a thorough review of the Campbell report that included an examination of both the data and methodologies utilized to construct the report findings. TSA concluded that the Campbell report and findings were insufficient for further consideration due to the report's use of limited data and broad, simplistic methodologies that did not consider the full spectrum of specific cost categories.

Joint Appendix ("J.A.") 468, *quoted in* Maj. Op. at 7, 8. Aside from this vague gesture toward the Campbell Report and its data, the remand decision does not address the discrepancy between DOT's estimate of 1.812 billion screened persons and SH&E's estimate of 865.5 million. The court interprets TSA's reference to "broad, simplistic methodologies" and "limited data" as an assessment of Campbell's uncritical adoption of DOT's estimate. Maj. Op. at 8. TSA's statement, however, cannot sustain that charitable reading.

TSA explicitly faulted the Campbell Report for its failure to "consider the full spectrum of specific cost categories." J.A. 468. This has nothing to do with DOT's estimate of the total number of passengers screened in 2000. To be sure, the SH&E Report attempts a more sophisticated comparative analysis of the respective costs of screening passengers and non-passengers than the Campbell Report. In particular, SH&E accounted for fixed costs that would have remained in the absence of non-passenger screenings, whereas Campbell

assumed non-passengers contributed an equal share to the cost of screening persons. *Compare* J.A. 279–323 (SH&E Report pt. 3), *with* J.A. 174–79 (Campbell Report). But this issue is beside the point. Accepting SH&E's estimates of the respective costs of individual passenger- and non-passenger screenings, a higher raw number of screenings would still result in a lower security fee for the Airlines than the one TSA calculated. There is no evidence TSA considered this critical difference between the reports at all.[2] Without considering the issue, TSA could not have reasonably decided to credit SH&E's estimate of total screenings over DOT's.

Even if TSA's denigration of the Campbell Report's "limited data" is interpreted as a reference to the DOT data, such conclusory treatment of alternative evidence "provides no basis upon which we could conclude that it was the product of reasoned decisionmaking." *Butte County, Cal. v. Hogen*, 613 F.3d 190, 195 (D.C. Cir. 2010) (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)). To merit deference, TSA ought to have given some reason for rejecting DOT's estimate. *See Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84,

---

[2] A letter written by TSA's Acting Assistant Chief Counsel after the agency's final remand decision confirms that the agency misunderstood the fundamental difference between the Campbell and SH&E Reports. Like the remand decision, the letter failed to mention—much less refute—DOT's estimate of 1.812 billion screened persons. In response to the airlines' "concern regarding SH&E's estimate of the ratio of passenger to non-passenger screenings," the letter points out that the Campbell report "extrapolated the experience of just six aviation industry representatives." J.A. 504. But Campbell relied on those six industry representatives to construct an estimate of the relative *average cost* of individual passenger and non-passenger screenings. Those surveys were irrelevant to the DOT data on the relative *volume* of passenger and non-passenger screenings.

4

93 (D.C. Cir. 2010) (remanding a rule "because . . . it defies the expert record evidence and is unexplained"). Labeling the DOT data "limited"—if indeed that pejorative may be read as a criticism of DOT's estimate—is not a reasoned explanation. In *United Mine Workers*, we concluded the challenged rule was arbitrary and capricious because the agency's only basis for rejecting contrary evidence was the agency's own "knowledge and expertise." 626 F.3d at 84. TSA's rejection of the Campbell Report, and its silent neglect of the DOT data contained therein, is no more descriptive. Such "[c]onclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review." *Id.* at 94 (quoting *AT&T Wireless Servs. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001)).

TSA does not even argue its decision on remand meets the standard we applied in *United Mine Workers*. Instead, TSA asks us to limit the holding of that case to situations where the neglected "contrary evidence" is "set forth in a congressionally-ordered study conducted by an independent federal agency with expertise in the subject matter." Respondent's Br. at 43. TSA does not explain why it is essential that the study be "congressionally-ordered" or why DOT's Bureau of Transportation Statistics lacks "expertise in the subject matter" of air transportation security statistics. Regardless of the specific character of the contrary evidence, an agency is required by "[b]asic principles of administrative law" to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *AT&T Wireless*, 270 F.3d at 968 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Our deference to the *substance* of an agency's decision does not permit us to ignore the *process* by which the agency makes it. The court rightly observes that an agency is entitled to especially strong deference where the relevant statute turns on "the [agency's] determination that certain conditions are present"—here the cost of screening passengers and property in 2000, as determined by the TSA—rather than "the objective existence of [those] conditions." Maj. Op. at 8 (quoting *Southwest I*, 554 F.3d at 1071). But even when our review is at its most deferential, we may not allow an agency to shirk its duty to provide a reason for choosing one body of evidence over another. In *AEP Texas North Co. v. STB*, 609 F.3d 432 (D.C. Cir. 2010), the court noted that the Surface Transportation Board was "entitled to particular deference" because the rate-setting decision at issue was one in which the Board acts "at the zenith of its powers." *Id.* at 438. Nevertheless, the court held that the Board acted arbitrarily and capriciously when it "entirely failed to consider an important aspect of the problem." *Id.* at 441. For the same reason, TSA should not be able to hide its neglect of DOT's estimate behind our standard of review.

The court's "most important[]" response to the Airlines' argument that TSA failed to consider the DOT data is that "the airlines presented no evidence that the figure in the [DOT] report was at all reliable." Maj. Op. at 9. The court conducts its own analysis of the DOT estimate, finds it to be based on self-serving, industry-reported data, and then concludes the SH&E Report's estimate of total screenings was more reliable. *Id.* at 9–10. This is exactly the sort of analysis TSA should have undertaken, and it is exactly the sort of reasoning to which a court may defer.[3] But TSA's

---

[3] This is not to say the court's reasoning is self-evidently correct. The SH&E Report's estimate of the ratio of passenger to non-passenger screenings was based on "passenger surveys" conducted

remand decision makes none of these findings, which appear for the first time as arguments in the agency's appellate brief. *See* Respondent's Br. at 38–42. Such post hoc justifications cannot satisfy the agency's obligation to give reasons for rejecting alternative evidence. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947); *United Mine Workers*, 626 F.3d at 94.

Especially where an agency adopts the reasoning of an outside consultant *in toto*, as TSA did here, the agency must articulate its reasons for rejecting evidence the consultant ignored. TSA's failure to do so leaves me with the sneaking suspicion that neither the agency nor its consultant ever seriously considered DOT's estimate. I would remand once again for further consideration and an explanation. *See United Mine Workers*, 626 F.3d at 94; *AT&T Wireless*, 270 F.3d at 968.

---

at two airports and on interviews with airport personnel. It is not obvious that the resulting estimate is more reliable than DOT's. The Campbell Report gives an intuitive explanation for DOT's large estimate of the number of non-passengers screened in 2000, relative to the present. Before 9/11, it was common for non-passengers to drop off and pick up passengers; screenings were less onerous; and airline, airport, vendor, and contractor employees passed easily and often through screenings. Most persuasively, the Campbell Report shows that the large reduction in screened persons between 2000 and 2006 (a drop from 1.812 billion to 708 million) corresponds to the increased transaction costs associated with TSA's management of the screening process and new rules restricting non-passengers from the "sterile" area of the airport. It is impossible to perform a similar comparison with the SH&E data TSA relied on, because SH&E did not estimate screening volume for any year besides 2000. Of course, TSA may have had a reasonable basis for favoring SH&E's much smaller estimate of year 2000 screenings, but the agency was obliged to explain its reasons.